UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                                          Bankruptcy No. 08-30847
                                                                                Chapter 7
Stephen M. Cremeans and
Kathleen L. Cremeans,

                Debtors.
_____/

Coulter Holding Co.,

                Plaintiff,

         vs.                                                              Adversary No. 08-7031

Stephen M. Cremeans,

                Defendant.
_____/

**MEMORANDUM AND ORDER**

      By Complaint filed October 17, 2008, Plaintiff Coulter Holding Co., initiated this adversary proceeding seeking a determination that Defendant Stephen M. Cremeans' obligation to Plaintiff in the amount of $38,924.61 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6). Defendant filed an Answer and Counterclaim on November 6, 2008, denying the allegations and alleging he is entitled to recover his garnished wages from Plaintiff in the amount of $1,699.77, plus interest. The matter was tried on February 12, 2009.

**I. FACTUAL BACKGROUND**

      Defendant owned and operated North Forks Motors, a used car lot. Dana Coulter, President of Coulter Holding Co., became acquainted with Defendant through a mutual acquaintance, Todd Nedberg. Coulter testified that he entered into an oral consignment agreement with Defendant whereby Coulter purchased vehicles and Defendant placed the vehicles on his car lot at North Forks Motors for

resale. According to their agreement, when a vehicle sold on Defendant's car lot, Defendant agreed to pay Plaintiff the original amount that Plaintiff paid for the vehicle plus one-half of the proceeds. Nedberg had a similar consignment arrangement with Defendant although the proceeds were split differently between Defendant and Nedberg.

A.      1994 Chevrolet K1500

Coulter testified that the first vehicle he placed on Defendant's lot was a 1994 Chevrolet K1500 that he purchased for $3,250.00. Defendant sold the K1500 for $6,000.00. Coulter testified he expected to receive payment of $4,625.00,[1] but Defendant never paid him.

Defendant testified that he paid Nedberg for various vehicles during the time period following the sale of the K1500 and that one of the checks he gave Nedberg contained Plaintiff's payment for the K1500 as well as Nedberg's payment. Defendant was unsure which check to Nedberg contained Plaintiff's payment, but he was sure that he paid Nedberg and expected that Nedberg would in turn pay Plaintiff. Defendant further testified that at that time, he owed Nedberg money in excess of the amount he was paying him.

Nedberg admitted that he received checks from Defendant during the time period in question. Nedberg testified that Defendant did not give him a payment for Plaintiff, but if he had, the check would have been made out to Plaintiff, and he could not have kept the money. Nedberg further admitted, however, that Defendant owed him enough money that if he received a check made out to solely him, he would "hang on to it."

Coulter testified he did not receive any payment from Nedberg.

---

[1] $3,250.00 (his original purchase price of the vehicle) plus $1,375.00 (one-half of the $2,750.00 profit) equals $4,625.00.

2

B.      Check Payments and Wire Transfers

Coulter began purchasing vehicles mainly from Minneapolis Auto Auction and NorthStar Auto Auction to place on Defendant's lot for resale. Coulter testified that on one occasion Defendant called him and said there were two vehicles that needed to be paid for at Northstar Auto Auction: a 2002 Chevy Camaro, in the amount of $9,445.19, and a 2002 Chrysler Concorde, in the amount of $6,592.14. Coulter testified that Defendant suggested the profits of the two vehicles would be split between them when they were sold. On January 24, 2007, Coulter paid NorthStar Auto Auction $16,037.33, including 90 day late fees. Coulter testified that he received some money from Defendant for the Camaro but could not recall how much. Defendant testified that he sold the Concorde on October 5, 2006, prior to when Coulter began doing business with him, and that he believes the Camaro was sold prior their relationship as well.

Coulter testified that in February 2007 he wired $21,615.00 to Missouri Corporate Credit Union for five vehicles. Coulter testified that Defendant contacted him yet on another occasion, stating that he had sold some vehicles on his lot and he needed $10,000.00 from Plaintiff in order to pay off his bank to get the titles free and clear. On March 5, 2007, Plaintiff paid $10,000.00 to Defendant.

C.      Promissory Note for $30,000.00

Coulter began having suspicions about the state of Defendant's business in the middle of February 2007. Coulter testified that in March 2007, Defendant owed Plaintiff approximately $47,000.00.[2] On March 16, 2007, Defendant signed a promissory note agreeing to pay Plaintiff $30,000.00 in monthly installments of $1,000.00. At that time, Defendant gave Plaintiff vehicle titles worth $17,000.00 for the remainder of the $47,000.00 owed. The parties also signed an Independent

---

[2] Although neither party testified as to the exact origin of the $47,000.00 debt, the Court assumes this debt is comprised of the checks for the Camaro and Concorde totaling $16,037.33, the $21,615.00 wire transfer, and the $10,000.00 check to clear vehicle titles.

3

Contractor Agreement on March 16, 2007, detailing their already existing oral consignment arrangement. The parties further agreed that if Coulter sold any vehicles on his own, Defendant would receive a $500.00 credit toward the $30,000.00 promissory note.[3]

Coulter testified that Defendant told him in June 2007 that his $400,000.00 home was on the market. Coulter further testified that he knew Defendant was having a tough time, but Defendant was progressing and Coulter thought that Defendant's business was going to work out.  Coulter testified he liked Defendant and he thought he would recover his money eventually because Defendant was a man of his word.

D.     2003 Chevrolet S-10 Sale and 2000 Chevrolet Silverado Trade-In

In June 2007, Defendant sold a 2003 Chevrolet S-10 and received a 2000 Chevrolet Silverado as a trade-in. Coulter testified that he told Defendant he wanted to purchase the Silverado from Defendant for his own use. Coulter issued a check for $12,500.00 to Defendant on June 15, 2007,[4] but Defendant sold the Silverado to someone else. Defendant testified that the $12,500.00 check from Plaintiff was to clear the title on the S-10 that was sold, not to purchase the Silverado. Defendant paid Coulter $5,000.00 and gave him a post-dated check[5] for the remaining $7,500.00. Defendant asked Plaintiff to hold the check until his tax refund arrived.

Coulter deposited the $7,500.00 check on October 5, 2007, and the check was returned on October 9, 2007, for insufficient funds. Defendant testified that Coulter did not contact him prior to

---

[3] Plaintiff's Complaint alleges Plaintiff sold 10 vehicles on his own, reducing the amount owed on the promissory note to $25,000.00. No evidence was presented to corroborate or refute this allegation.

[4] The parties agreed that the check at issue was inadvertently dated June 15, 2006, and should have been dated June 15, 2007.

[5] "Hold for tax refund" is written on the memo line of the $7,500.00 check pay to the order of Dana Coulter, dated October 3, 2007.

4

depositing the check to make sure that Defendant's tax refund had arrived. Defendant testified that he had moved, and the tax refund check was not forwarded by the postal service. Defendant had to wait until the tax refund check was returned to the Internal Revenue Service (IRS), and then the IRS mailed the tax refund check to his new address.

E. Promissory Note for $7,500.00

On November 3, 2007, Defendant entered into a second promissory note for the additional $7,500.00 owed to Plaintiff. Payment was due on January 3, 2008. Defendant sent a check for $7,500.00 to Coulter, and Coulter deposited it on January 4, 2008. On January 11, 2008, the check was returned for insufficient funds.

Defendant testified throughout the trial that he had full intentions of paying Plaintiff and wanted to make good on his debts to Plaintiff, but he was unable to do it. Defendant's wife developed an unforeseen medical problem, cancer on her eye. Defendant testified it was necessary for him and his wife to travel to Philadelphia for treatment, and the travel and other expenses totaled $2,800.00. Defendant also testified he was financially strapped and did not have a floor plan or the necessary financing to get vehicles on his own. Defendant further testified that he would have had to shut down his business long before he did it if were not for Coulter and Nedberg putting cars on his lot. Defendant testified he normally had 25-50 vehicles on his lot, but in the end, the number of vehicles on the lot had dwindled down to 12. The mortgage on the building was $2,200.00 per month and he also had a second mortgage. Defendant testified he was incurring losses and he cut his overhead in an attempt to reduce costs. He previously had mechanics and sales people, but he was the only one working in the end.

F. State Court Default Judgment

Plaintiff initiated a state court action against Defendant on March 15, 2008, alleging Defendant

5

owed $25,000.00 on the March 16, 2007, promissory note. Defendant failed to file an answer, and a default judgment was entered on May 30, 2008, against Defendant and North Forks Motors, LLC, for the sum of $25,000.00 plus interest and taxes for a total amount of $26,799.61, plus post judgment interest. Plaintiff garnished Defendant's wages from June 8 through August 23, 2008, in the total amount of $1,699.67.

G.    Additional Payments to Plaintiff

The following payments from Defendant, totaling $98,223.50, were deposited into Plaintiff's business account or Coulter's personal account from February 19, 2007, to November 24, 2007:

| Pay to the order of | Amount | Date | Account deposited into |
|---|---|---|---|
| Dana Coulter | $ 11,274.00 | February 19, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 10,600.00 | March 29, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 7,450.00 | April 6, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 7,165.00 | May 29, 2007 | Plaintiff's Town & Country Account |
| Dana Coulter | $ 1,250.00 | May 29, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 4,572.50 | June 15, 2007 | Plaintiff's Town & Country Account |
| Dana Coulter | $ 4,850.00 | June 22, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 6,000.00 | June 23, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 3,400.00 | June 27, 2007 | Coulter's Wells Fargo Account |
| Dana Coulter | $ 3,500.00 | July 19, 2007 | Coulter's Wells Fargo Account |
| Coulter Holding Co. | $ 8,325.00 | July 31, 2007 | Plaintiff's Town & Country Account |
| Dana Coulter | $ 500.00 | October 23, 2007 | Plaintiff's Town & Country Account |
| Coulter Holding Co. | $ 4,580.00 | October 23, 2007 | Plaintiff's Town & Country Account |
| Coulter Holding Co. | $ 6,525.00 | November 3, 2007 | Plaintiff's Town & Country Account |
| Coulter Holding Co. | $ 8,627.00 | November 15, 2007 | Plaintiff's Town & Country Account |
| Coulter Holding Co. | $ 9,605.00 | November 24, 2007 | Plaintiff's Town & Country Account |

H.    Bankruptcy

Defendant filed a voluntary bankruptcy petition on August 26, 2008. Defendant amended his schedules on September 19, 2008, and claimed $1,377.00 of the $1,699.67 in garnished wages as exempt under N.D.C.C. § 28-22-03. On his Amended Schedule C, Defendant claimed additional property worth $3,623.00 as exempt under this statute for a total of $5,000.00.

In its Complaint, Plaintiff alleges three causes of action under which Defendant's obligations

6

are nondischargeable under 11 U.S.C. § 523(a)(2), (4), and (6). Plaintiff alleges in its first cause of action that Defendant's obligation in the amount of $4,625.00, relating to the K1500, is nondischargeable. In its second cause of action, Plaintiff alleges the state court default judgment in the amount of $26,799.61 is nondischargeable. Plaintiff alleges in its third cause of action that Defendant's obligation in the amount of $7,500.00 is nondischargeable. Plaintiff also seeks costs, disbursements and attorney's fees.

In his Counterclaim, Defendant alleges he is entitled to recover his garnished wages from Plaintiff in the amount of $1,699.77, plus interest.

## II. CONCLUSIONS OF LAW

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002). Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993). The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991); Simek v. Erdman (In re Erdman), 236 B.R. 904, 910 (Bankr. D.N.D. 1999). Where an objecting plaintiff fails to establish every element under section 523(a), the indebtedness at issue is dischargeable. Id.

A.      11 U.S.C. § 523(a)(2)(A)

Section 523(a) of the Bankruptcy Code exempts certain debts from discharge in bankruptcy, including debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). To establish

nondischargeability under section 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that:

>   (1) the debtor made a representation;
>   (2) at the time the representation was made the debtor knew it was false;
>   (3) the debtor subjectively intended to deceive the creditor at the time he made the representation;
>   (4) the creditor justifiably relied on the representation; and
>   (5) the creditor was damaged.

Blue Skies, Inc. v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007). Where an objecting party fails to establish every element of a section 523(a)(2)(A) action, the indebtedness at issue is dischargeable. Simek v. Erdman (In re Erdman), 236 B.R. 904, 910 (Bankr. D.N.D. 1999). Exceptions to discharge are narrowly construed against a creditor and liberally in favor of the debtor to effectuate fresh start policy of the Bankruptcy Code. Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

Plaintiff argues Defendant's debts outlined in Plaintiff's three causes of action are nondischargeable under section 523(a)(2)(A) because Defendant breached numerous promises and inducements to deliver titles and sales proceeds, and obtained money from Plaintiff by false pretenses, false representation and actual fraud. Plaintiff further suggests Defendant never had any intention to pay the debts as he had represented he would. Defendant argues the obligations are dischargeable because he did not obtain the money through misrepresentation or fraud.

Regarding the first cause of action relating to the K1500, Defendant does not dispute that he represented to Plaintiff that he would pay Plaintiff the original purchase price plus one-half of the proceeds. Defendant testified he paid the amount in dispute by including Plaintiff's payment in a check he gave to Nedberg. Nedberg admitted Defendant owed him money at the time, and if the check was made out solely to him, he would have kept the money. Considering the facts that: 1) the parties' arrangement was established due to Nedberg's involvement, 2) this was the first transaction between

8

the parties, and 3) Defendant owed Nedberg money, it is reasonable to conclude that Defendant paid Nedberg and Nedberg never in turn paid Plaintiff.

Even if Defendant did not include Plaintiff's payment in a check he gave to Nedberg, there is no evidence that at the time of the representation that Defendant knew it was false or that Defendant subjectively intended to deceive the Plaintiff. To the contrary, the evidence supports that Defendant at all times believed he would and intended to repay Plaintiff. Defendant testified throughout the trial that he intended to make good on his debts. Defendant made almost $100,000.00 in payments to Plaintiff in a nine-month period as well as reduced the $47,000.00 debt to $25,000.00 in one year's time. Defendant admitted he was financially strapped and he was reducing overhead expenses in order to make his business work. Further, Defendant testified his wife was diagnosed with cancer, and the unforeseen expenses related to her treatment were necessary.

In short, Plaintiff has failed to carry its burden of proving Defendant knew or should have known that the representation relating to the K1500 was false at the time it was made, or that Defendant intended to deceive Plaintiff. Plaintiff's section 523(a)(2)(A) claim under its first cause of action fails. The Court need not analyze any other factors because Plaintiff must prove all five factors to succeed on its claim.

Regarding the second cause of action, Defendant does not dispute that he made representations that he would repay Plaintiff the money and wire transfers, nor does Defendant dispute that he signed a promissory note for $30,000. Plaintiff suggests Defendant represented to Plaintiff that if Plaintiff paid NorthStar Auction for the Concorde and the Camaro, he would receive half of the profit when the vehicles were sold. Defendant, however, testified that the vehicles were sold prior to Plaintiff's involvement. Plaintiff's receipt from NorthStar Auto Auction reflects a ninety day late fee putting Plaintiff on notice at the time he paid that the vehicles were not recently purchased. Plaintiff falls short

9

in establishing that the Defendant knew at the time the representations were made, i.e., when he requested that Plaintiff pay off various vehicles by wire transfer and check, or at the time the $30,000.00 promissory note was signed, that he would not pay Plaintiff back or comply with their promissory note terms. The evidence demonstrates to the contrary. Plaintiff admits he received payment from Defendant for the Camaro, although he does not remember how much. Further, the parties agree that in March 2007, Defendant owed Plaintiff $47,000.00. At the time the parties signed the promissory note, Defendant could have agreed to sign a promissory note for the total amount of $47,000.00, but he did not. Instead, Defendant made a good faith effort to reduce his debt and paid Plaintiff over $17,000.00 in vehicle titles toward the amount owed. This is evidence that Defendant intended to pay Plaintiff on the various transactions. Further, the parties agreed that Plaintiff would credit $500.00 to Defendant's promissory note for each vehicle that Plaintiff sold on his own. In his pleadings, Plaintiff alleges that he sold 10 vehicles on his own, which correlates with the $25,000.00 that Plaintiff alleged was the outstanding balance on the promissory note in the state court action. The evidence shows that Defendant's debt for check advances and wire transfers was reduced by almost half, from $47,000.00 to $25,000.00 in one year's time. Moreover, at least 16 other payments were made by Defendant to Plaintiff in the amount of $98,223.50 from February 19, 2007, through November 24, 2007. In sum, not only was there a $22,000.00 reduction of the original amount of the $47,000.00 owed to Plaintiff, but Defendant also made almost $100,000.00 in payments to Plaintiff in a nine-month period.

      Plaintiff has failed to carry its burden of proving Defendant knew or should have known that the representations that he would pay back various amounts owed or that he would comply with the promissory note were false at the time each was made, or that Defendant intended to deceive Plaintiff. Plaintiff's section 523(a)(2)(A) claim under its second cause of action fails.

10

Plaintiff's third cause of action relates to Plaintiff's payment to Defendant in the amount of $12,500.00. Defendant does not dispute that he made representations to pay Plaintiff for the $12,500.00. There is a dispute as to what the $12,500.00 was intended for. Defendant testified that he requested $12,500.00 to clear up title on an S-10 that he sold. Coulter testified that he gave Defendant $12,500.00 to purchase a Silverado that Defendant was receiving as a trade-in at the time the S-10 was sold. Plaintiff has had a history of wiring money, paying off Defendant's bank, and paying the balances of vehicles at auction in order to get vehicle titles free and clear for Defendant. At worst, there appears to have been a miscommunication. Defendant paid over $5,000.00 shortly thereafter on the amount owing.

Plaintiff has failed to carry its burden of proving that Defendant knew or should have known the representations (that he would pay back various amounts owed or that he would comply with the promissory note) were false at the time they were made. Further, there is no evidence that Defendant intended to deceive Plaintiff. Plaintiff's section 523(a)(2)(A) claim under its third cause of action fails.

B.     11 U.S.C. 523(a)(4)

Plaintiff also alleges that Defendant's conduct constitutes fraud or defalcation under section 523(a)(4). The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). In its General Counts, Plaintiff alleges that Defendant has committed fraud or defalcation while acting in a fiduciary capacity, has embezzled funds from Plaintiff, and has committed larceny against Plaintiff.

    1.     Fiduciary Capacity

To prevent the discharge of Defendant's debt under section 523(a)(4), Plaintiff must establish the following two elements: (1) Defendant was acting in a fiduciary capacity; and (2) he committed

11

fraud or defalcation in the course of that fiduciary relationship. See Jafarpour v. Shahrokhi (In re Shahrokhi), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001).

Whether a relationship is a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4) is an issue of federal law. Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997), In re Cochrane, 124 F.3d at 984. "'[T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt.'" Id. (quoting Lewis v. Scott, 97 F.3d 1182, 1185 (9th Cir. 1996)). The fiduciary relationship required under section 523(a)(4) is more narrowly defined than that under the general common law. In re Shahrokhi, 266 B.R. at 707. An express or technical trust may be one in which a formal document is executed which establishes the rights and duties of the parties, or one in which trust-type obligations are imposed pursuant to statute or common law. Bast v. Johnson (In re Johnson), 174 B.R. 537, 541 (Bankr. W.D. Mo. 1994). As a result, the broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable. Id. A merely contractual relationship is less than what is required to establish the existence of a fiduciary relationship. In re Hofmann, 5 F.3d at 1172.

In the case at hand, the oral consignment arrangement between the parties, which was later reduced to writing in March 2007, amounts to nothing more than a contractual agreement. Plaintiff and Defendant's agreement did not create a fiduciary relationship between the parties, and Plaintiff's claim fails.

2.      Embezzlement

Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." Belfry v. Cardozo (In re Belfry), 862 F.2d 661, 662 (8th Cir. 1988). It is the subsequent possession by the debtor that becomes unlawful.

12

Montegomery v. Montegomery (In re Montegomery), 236 B.R. 914, 922 (Bkrtcy. D.N.D 1999). To prove embezzlement, a creditor must prove that the debtor acted with fraudulent intent. Id. The embezzlement exception requires that Defendant improperly used the creditor's property before complying with some obligation to Plaintiff. In re Belfry, 862 F.2d at 663.

In this case, there is no evidence that Defendant acted with fraudulent intent or that the Defendant improperly used the creditor's property before complying with some obligation to Plaintiff. The embezzlement exception does not apply because at no time did Defendant's possession become unlawful.

    3.    Larceny

Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner. Eggelston v. Eggelson (In re Eggelston), 243 B.R. 365 (Bankr.W.D.No. 2000) (citing Rech v. Burgess (In re Burgess), 106 B.R. 612, 622 (Bankr. D. Neb. 1989)). The essential difference between larceny and embezzlement is the manner in which property comes into the possession of the person charged. Id. As the original taking and possession of Plaintiff's property by Defendant was not unlawful, Defendant therefore did not commit larceny with respect to Plaintiff's property, and the larceny exception does not apply.

C.    11 U.S.C. § 523(a)(6)

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The terms "willful" and "malicious" are two distinct elements, and each must be shown to establish an exception to discharge. Porter v. Porter, (In re Porter), 375 B.R. 822, 827 (B.A.P. 8th Cir. 2007).

The term willful means deliberate or intentional. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); In re Porter, 375 B.R. at 827. The injury, and not merely the act leading to the injury, must be deliberate or intentional. Geiger, 523 U.S. at 61- 62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial injury. Madsen v. Lease, 195 F.3d 988, 989 (8th Cir. 1999); D'Amato v. D'Amato (In re D'Amato), 341 B.R. 1, 4-5 (B.A.P. 8th Cir. 2006). Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. In re Porter, 375 B.R. at 827. A debtor acts with malice by intending or fully expecting to harm the economic interests of the creditor. Id. The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent additional aggravating circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003). It is the intent to cause harm to the creditor which must exist for an injury to be malicious. In re Porter, 375 B.R. at 827. To prove nondischargeability in the instant case, Plaintiff must prove that Defendant incurred a debt for a (1) willful and malicious (2) injury (3) to its property.

There is no evidence in this case that Defendant's acts were deliberate or intentional in order to cause injury to Plaintiff. In fact, the evidence supports otherwise. As previously stated, Defendant testified throughout the trial that he intended to make good on his debts. Defendant made almost $100,000.00 in payments to Plaintiff in a nine-month period as well as reduced the $47,000.00 debt to $25,000.00 in one year's time. Defendant admitted he was financially strapped and he was reducing overhead expenses in order to make his business work. Further, Defendant testified his wife was diagnosed with cancer, and the unforeseen expenses related to her treatment were necessary. There is simply no evidence that Defendant's culpability rose to the level of intending or fully expecting to cause economic harm to Plaintiff. Therefore, Plaintiff did not meet his burden of proving that

14

Defendant's acts were willful or malicious. Plaintiff's claims for nondischargeability also fail under 523(a)(6).

D.  Counterclaim for Garnished Wage Exemption

Defendant alleges that his garnished wages in the amount of $1,699.77 are exempt under 11 U.S.C. §§ 547, 522(h) and 522(i).

Section 541(a)(1) of the Bankruptcy Code provides that, at the commencement of a case, the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). In general, wages earned prepetition are legal interests of the debtor and are therefore property of the estate. See In re Adcock, 264 B.R. 708, 716 (D. Kan. 2000); In re Danowski, 320 B.R. 886, 889 (Bankr. N.D. Ohio 2005).

The Code allows debtors to exempt certain property from the bankruptcy estate. 11 U.S.C. § 522(b)(1). Exempt property is excluded from property of the estate available to satisfy debts. Benn v. Cole (In re Benn), 491 F.3d 811, 813 (8th Cir. 2007). Section 522(b)(2) authorizes states to opt out of the federal scheme of property exemptions enumerated in § 522(d). Exercising this grant of authority, North Dakota has enacted its own set of property exemptions for purposes of bankruptcy, limiting its residence to claiming the state exemptions rather than the federal exemptions. See N.D.C.C. § 22-22-17. Exemption statutes are construed liberally in favor of the debtor. Wallerstedt v. Sosne (In re Wallerstedt), 930 F.2d 630, 631 (8th Cir. 1991).

On his Amended Schedule C, Defendant claimed $1,377.00 of the $1,699.67 garnished wages as exempt under N.D.C.C. § 28-22-03. This statute provides that a debtor may exempt property worth up to $5,000.00. On his Amended Schedules, Defendant claimed other property as exempt under this statute for a total of $5,000.00. Coulter and Defendant testified that $1,699 of Defendant's wages were garnished. There were no objections at trial as to Defendant's evidence of wage garnishment nor was

15

there any showing that Defendant's exemption was not properly claimed. The Court finds that Defendant's claim for wage exemption in the amount $1,377.00 stands.

Based on the foregoing, Plaintiff failed to prove its claims under section 523(a)(2), (4) and (6) by a preponderance of the evidence. The debts at issue, in the total amount of $38,924.61, are not postpetition debts and are dischargeable. The Court has considered the parties' requests to be awarded its costs and attorney fees and denies the same. Defendant's wage exemption is allowed and Defendant is entitled to the return of those funds from Plaintiff.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this March 19, 2009

**WILLIAM A. HILL, JUDGE**
**U.S. BANKRUPTCY COURT**